# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

FEDERAL TRADE COMMISSION, )
)
        Plaintiff, ) Civil No.
)
        v. )
)
NATIONAL SALES GROUP, )
a California corporation, )
)
I LIFE MARKETING LLC, )
a California limited liability company, )
also d/b/a EXECUTIVE SALES NETWORK )
and CERTIFIED SALES JOBS, )
)
ANTHONY J. NEWTON, and )
)
JEREMY S. COOLEY, )
)
        Defendants. )
)

**FILED**

FEB 2 2 2011

**MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT**

11-cv-01230
Judge Ronald A. Guzman
Magistrate Judge Jeffrey T. Gilbert

**FEDERAL TRADE COMMISSION'S MEMORANDUM IN SUPPORT OF
ITS *EX PARTE* MOTION FOR A TEMPORARY RESTRAINING ORDER
WITH ASSET FREEZE, OTHER EQUITABLE RELIEF, AND ORDER TO
SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE**

# TABLE OF CONTENTS

I.     INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    DEFENDANTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III.   DEFENDANTS' UNLAWFUL BUSINESS PRACTICES . . . . . . . . . . . . . . . . . . . 5

       A.    Defendants' Fraudulent Help Wanted Ads . . . . . . . . . . . . . . . . . . . . . . . . 5

       B.    Outbound Calls and Voicemails . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

       C.    Defendants' Deceptive Sales Pitch . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

       D.    Defendants' Purported Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

       E.    Unauthorized Charges and Denial of Refunds . . . . . . . . . . . . . . . . . . . . . 13

       F.    Defendants' Continued Operations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

IV.    ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

       A.    This Court has Authority to Grant the Requested Relief . . . . . . . . . . . . . . . 17

       B.    The Commission Meets the Applicable Legal Standard for Issuance of a
             Temporary Restraining Order and Preliminary Injunction . . . . . . . . . . . . . . 17

       C.    The FTC Has Demonstrated a Strong Likelihood of Success on the Merits . . . . 18

             1.    Defendants Are Violating the FTC Act and the TSR . . . . . . . . . . . . . . 18

             2.    Anthony Newton and Jeremy Cooley Are Individually Liable . . . . . . . . 20

       D.    The Equities Tip Decidedly in the Commission's Favor . . . . . . . . . . . . . . . . 21

       E.    The Court Should Enter the FTC's Proposed TRO . . . . . . . . . . . . . . . . . . . 22

V.     CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

## TABLE OF AUTHORITIES

### Cases

*FTC v. 120194 Canada Ltd., et al.*, No. 04 C 7204 (N.D. Ill. Nov. 8, 2004) . . . . . . . . . . . . . . . 22

*FTC v. 1522838 Ontario Inc., et al.*, No. 06 C 5378 (N.D. Ill. Oct. 4, 2006) . . . . . . . . . . . . . . 22

*FTC v. 2145183 Ontario Inc., et al.*, No. 09 C 7423 (N.D. Ill. Nov. 30, 2009) . . . . . . . . . . . . 22

*FTC v. 3R Bancorp, et al.*, No. 04 C 7177 (N.D. Ill. Nov. 17, 2004) . . . . . . . . . . . . . . . . . . . . 22

*FTC v. 6555381 Canada Inc., et al.*, No. 09 C 3158 (N.D. Ill. June 1, 2009) . . . . . . . . . . . . . 22

*FTC v. 6654916 Canada Inc., et al.*, No. 09 C 3159 (N.D. Ill. May 27, 2009) . . . . . . . . . . . . 22

*FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564 (7th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . 17, 20

*FTC v. API Trade, LLC, et al.*, No. 10 C 1543 (N.D. Ill. March 10, 2010) . . . . . . . . . . . . . . . . . 22

*FTC v. Asia Pacific Telecom, Inc., et al.*, No. 10 C 3168 (N.D. Ill. May 25, 2010) . . . . . . . . . 22

*FTC v. Atkinson, et al.*, No. 08 C 5666 (N.D. Ill. Oct. 6, 2008) . . . . . . . . . . . . . . . . . . . . . . . . 22

*FTC v. AVS Mktg., Inc., et al.*, No. 04 C 6915 (N.D. Ill. Oct. 28, 2004) . . . . . . . . . . . . . . . . . 22

*FTC v. Bay Area Business Council, Inc.*, 423 F.3d 627 (7th Cir. 2005) . . . . . . . . . 3-4, 17-18, 20

*FTC v. Bay Area Business Council, Inc., et al.*, No. 02 C 5762,
2003 U.S. Dist. LEXIS 3865 (N.D. Ill. April 30, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*FTC v. Cleverlink Trading Ltd., et al.*, No. 05 C 2889 (N.D. Ill. May 16, 2005) . . . . . . . . . . . 22

*FTC v. Cleverlink Trading Ltd., et al.*, No. 05 C 2889,
2006 U.S. Dist. LEXIS 45244 (N.D. Ill. June 19, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*FTC v. Data Bus. Solutions, Inc., et al.*, No. 08 C 2783 (N.D. Ill. May 14, 2008) . . . . . . . . . . 22

*FTC v. Datacom Mktg., et al.*, No. 06 C 2574 (N.D. Ill. May 9, 2006) . . . . . . . . . . . . . . . . . . . 22

*FTC v. Datacom Mktg. Inc.*, No. 06 C 2574, 2006 U.S. Dist. LEXIS 33029
(N.D. Ill. May 24, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17-18, 21

*FTC v. Febre*, 128 F.3d 530 (7th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*FTC v. Global Mktg. Group, Inc.*, 594 F. Supp. 2d 1281 (M.D. Fla. 2008) . . . . . . . . . . . . . . . 19

*FTC v. Integration Media, Inc., et al.*, No. 09 C 3160 (N.D. Ill. May 27, 2009) . . . . . . . . . . 22

*FTC v. J.K. Publications, Inc.*, 99 F. Supp. 2d 1176 (C.D. Cal. 2000) . . . . . . . . . . . . . . . . . . 19

*FTC v. Neovi, Inc.*, 598 F. Supp. 2d 1104 (S.D. Cal. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*FTC v. Sabal,* 32 F. Supp. 2d 1004, 1009 (N.D. Ill. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*FTC v. Select Personnel Mgmt., Inc., et al.,* No. 07 C 0529 (N.D. Ill. Feb. 7, 2007) . . . . . . . . 22

*FTC v. Sili Neutraceuticals, LLC, et al.,* No. 07 C 4541 (N.D. Ill. Aug. 13, 2007) . . . . . . . . . 22

*FTC v. Spear Systems, Inc., et al.,* No. 07 C 5597 (N.D. Ill. Oct. 3, 2007) . . . . . . . . . . . . . . . . 22

*FTC v. Voice Touch, Inc., et al.,* No. 09 C 2929, (N.D. Ill. May 15, 2009) . . . . . . . . . . . . . . . . 22

*FTC v. Warner Communications, Inc.,* 742 F.2d 1156, 1160 (9th Cir. 1984) . . . . . . . . . . . . . . 17

*FTC v. World Media Brokers,* 415 F.3d 758 (7th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . 18, 20

*FTC v. World Travel Vacation Brokers, Inc.,* 861 F.2d 1020 (7th Cir. 1988) . . . . . . . . 17-18. 21

*FTC v. World Wide Factors, Ltd,* 882 F.2d 344 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . 21

*Kraft, Inc. v. FTC,* 970 F.2d 311 (7th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Orkin Exterminating Co., Inc. v. FTC,* 849 F.2d 1354 (11th Cir. 1988) . . . . . . . . . . . . . . . . . . 18

*Sunshine Art Studios, Inc. v. FTC,* 481 F.2d 1171 (1st Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . 4

**Statutes**

15 U.S.C. § 45(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2, 18

15 U.S.C. § 45(n) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

15 U.S.C. § 53(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 17

28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

28 U.S.C. § 1337(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

28 U.S.C. § 1345 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

28 U.S.C. § 1391(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**Rules and Regulations**

16 C.F.R. Part 310 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 19-20

Fed. R. Civ. P. 65 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

## I.   INTRODUCTION

We ask that the Court take immediate action to end the deceptive practices of an enterprise that has made millions by defrauding consumers who are unemployed and looking for jobs. Defendants have posted fake help wanted ads in newspaper classifieds and on Internet job boards, describing high-paying sales jobs that, according to the ads, are available in local areas across the country. But the defendants are not hiring, and have no connection to anyone who is. This is nothing more than a scheme to take money from people who are already in a financial hole.

This operation has principally used the name National Sales Group ("NSG"), though it has recently changed names in an attempt to escape its reputation as a scam. Over the last several years it has produced more than 17,000 consumer complaints and defrauded consumers out of at least $8 million dollars. NSG has an "F" rating with the Better Business Bureau.

Tens of thousands of consumers have responded to NSG's help wanted ads by calling toll-free phone numbers listed in the ads for "human resources." Consumers who call are connected to defendants' telemarketing boiler room where defendants reinforce and embellish the claims that they are either hiring themselves or are authorized to hire on behalf of major corporations. In these calls defendants claim that they are a recruitment firm paid by Fortune 1000 companies to find the best candidates for open positions in sales. They claim that they can arrange interviews for consumers within 2-4 weeks that are likely to lead to jobs with attractive pay and benefits. They then tell consumers that in order to go forward the consumers must pay a small sum for "pre-screening" fees and other services tied to the hiring process.

In fact, defendants have no jobs, are not recruiters paid by Fortune 1000 employers, and do not know what, if any, jobs are currently available in consumers' local areas. After getting

credit card numbers from consumers the defendants do no more than refer consumers to help wanted ads posted by other companies, which defendants have cut and pasted from free public job sites. Defendants have no connection to these companies, and no unique ability to get consumers interviews or place them in jobs. To make matters worse, defendants often charge consumers extra fees without authorization, and ignore consumers' requests for refunds.

This scheme has generated thousands of consumer complaints to the Better Business Bureau, law enforcement agencies, online forums and job boards. Defendants' help wanted ads on CareerBuilder.com generated so many complaints – over 17,000 – that CareerBuilder kicked them off its site in July 2010. Defendants attempted to get CareerBuilder to let them continue running ads under a different name but CareerBuilder refused. Defendants then shifted their approach to cold-calling. This enterprise now relies on telemarketing to lure consumers with bogus employment opportunities and then deliver the same deceptive sales pitch as before.

Needless to say, these deceptive practices squarely violate federal consumer protection laws including Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and several provisions of the Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310. Defendants' false claims and unauthorized billing of consumers violate both Section 5(a) and the TSR.

The FTC's evidence of these law violations is overwhelming. The FTC has submitted, along with this motion, declarations from 18 consumers victimized by defendants' scheme; declarations from two employers whose publically available help wanted ads were forwarded to consumers as part of defendants' bogus services; a declaration from CareerBuilder describing the events leading up to its decision to bar NSG from its site; and a declaration from an FTC investigator who posed as a consumer and experienced defendants' scheme first hand.

2

Taken together, this evidence reveals an enterprise utterly permeated with fraud, leaving no doubt that the FTC is likely to succeed in showing that defendants are violating the FTC Act and the TSR. As a result, the FTC asks that the Court issue an *ex parte* TRO that includes a freeze of defendants' assets and the appointment of a temporary receiver over the corporate defendants. The requested relief is necessary to prevent continued injury to consumers, the destruction of evidence, and the dissipation of assets, thereby preserving the Court's ability to provide effective final relief. In short, we ask that the Court stop the deceptive practices and preserve assets so that victims can, hopefully, get some of their money back.

## II.   DEFENDANTS

Defendants are two interrelated companies and the individuals who control them. The corporate defendants are National Sales Group ("NSG"), a California corporation, and I Life Marketing LLC ("I Life"), a California limited liability company.[1] Both companies operate from the same business premises in Santa Barbara, California, sharing management, finances, and business practices. As part of the same business, I Life uses the names Executive Sales Network and Certified Sales Jobs.[2] The individual defendants are Anthony Newton ("Newton") and Jeremy Cooley ("Cooley"). Newton is the President and CEO of NSG. Both Newton and Cooley are managers of I Life.[3] Because Defendants operate the business as a common enterprise, they all are jointly and severally liable for their various law violations. *See FTC v.*

---

[1] Plaintiff's Exhibit ("PX") 1, Menjivar Dec., ¶ 6 & Att. A-E (corporate records).

[2] *Id.*, ¶¶ 6(c), 6(e), 7, 18-21 & Atts. C, E-F, N (corporate records, fictitious business name statement, and telephone records); PX 2, Butler Dec., ¶¶ 5, 14-19 & Atts. D-F (Newton and Cooley email correspondence with CareerBuilder); PX 13, Jones Dec., ¶¶ 8-9 & Att. D (letter from I Life/Certified Sales Jobs to N.C. Attorney General's office faxed from NSG).

[3] PX 1, Menjivar Dec., ¶¶ 6(c), 6(e), 7 & Atts. C, E-F.

3

*Bay Area Business Council, Inc.*, 423 F.3d 627, 635 (7th Cir. 2005); *Sunshine Art Studios, Inc. v. FTC,* 481 F.2d 1171, 1173, 1175 (1st Cir. 1973); *FTC v. Neovi, Inc.*, 598 F. Supp. 2d 1104, 1116 (S.D. Cal. 2008).

This matter is properly before the Court. The Court has subject matter jurisdiction over the FTC Act and TSR claims pursuant to 28 U.S.C. §§ 1331, 1337(a) and 1345. This Court also has personal jurisdiction over defendants. Section 13(b) of the FTC Act provides that "process may be served on any person, partnership, or corporation wherever it may be found." 15 U.S.C. § 53(b). Courts have consistently held that, since process can be served anywhere in the United States under the FTC Act, personal jurisdiction is proper anywhere in the United States as well.[4] Defendants in this case clearly have the necessary minimum contacts with the United States for purposes of personal jurisdiction. Defendants, moreover, have established significant contacts with the Northern District of Illinois – they have targeted this district with their help wanted ads, received voluminous calls from consumers in response, and advertised heavily through Chicago-based CareerBuilder.[5]

---

[4] *FTC v. Cleverlink Trading Ltd., et al.*, No. 05-2889, 2006 U.S. Dist. LEXIS 45244, at *14-15 (N.D. Ill. June 19, 2006); *FTC v. Bay Area Bus. Council, Inc., et al.*, No. 02 C 5762, 2003 U.S. Dist. LEXIS 3865, at *6 (N.D. Ill. April 30, 2003) ("When a federal statute provides for nationwide service of process, as the FTC Act does, personal jurisdiction may be obtained over any defendant having minimum contacts with the United States as a whole.").

[5] *See* PX 1, Menjivar Dec., ¶¶ 22(a), 22(b) & Atts. O-P (help wanted ads in newspaper classifieds targeting Rockford and Carroll County in northwest Illinois); *id.*, ¶ 20 (hundreds of calls to defendants each month originating from northern Illinois area codes); PX 2, Butler Dec., ¶ 7 (job postings on CareerBuilder targeting Chicago and Rockford); *id.*, ¶¶ 1, 5, 15-19 & Atts. D-F (defendants' contacts with CareerBuilder). Venue is proper pursuant to the FTC Act, which provides that an action may be brought in any district where a corporation or person "resides or transacts business" 15 U.S.C. § 53(b), and pursuant to 28 U.S.C. § 1391(c), which provides that venue is proper in any judicial district in which a defendant corporation is subject to personal jurisdiction.

## III.  DEFENDANTS' UNLAWFUL BUSINESS PRACTICES

Since 2005, defendants have run fake help wanted ads in a variety of mediums to lure consumers into paying fees for access to sham employment opportunities. In newspapers, online, and over the telephone, defendants represent that they are hiring consumers, or are directly involved in the hiring of consumers by major companies. They claim to have openings in consumers' local areas for high-paying sales jobs. In truth, defendants are not hiring, and have no affiliation or special relationship with anyone who is. Consumers who pay defendants' fees are no closer to getting jobs than they are on their own.

### A.  Defendants' Fraudulent Help Wanted Ads.

Defendants advertise sales jobs offering substantial pay and benefits. Defendants' ads have appeared in local and regional newspapers and on various Internet job boards including CareerBuilder.com. The ads are designed to look like genuine employment opportunities, and include key details about the job. Defendants direct interested consumers to call a toll-free telephone number.[6]

Typical of the help wanted ads that defendants have placed in newspaper classifieds is the following, from the May 26, 2010 edition of the Rock River Times, published in Rockford, Illinois:

---

[6] PX 1, Menjivar Dec., ¶¶ 10-11, 22 & Atts. I-J (promotional video on MySpace) & Atts. O-S (help wanted ads from newspaper classifieds and online job sites); PX 2, Butler Dec., ¶¶ 4, 6-8 (job postings on CareerBuilder); PX 15, Lessard Dec., ¶¶ 2-4 & Att. A (copy of job posting from CareerBuilder); *see also* PX 5, Burgess Dec., ¶ 2; PX 6, Callihan Dec., ¶ 2; PX 7, Campbell Dec., ¶¶ 2-3; PX 10, DeIuliis Dec., ¶ 2; PX 11, Dumas Dec., ¶ 2; PX 12, Goodson Dec., ¶ 2; PX 14, Kamburoff Dec., ¶¶ 2-3; PX 16, Minieri Dec., ¶ 2; PX 18, Prescott Dec., ¶ 2; PX 21, Socha Dec., ¶ 2.

SALES & ACCT EXECS NEEDED!
Make $45,000-$80,000/yr No
Exp Needed, Paid Training! Ben-
efits, Bonuses – FT/PT avail.  For
more info 866-809-3957. N 5/26[7]

Defendants have placed similar ads in numerous local publications around the country.[8]

Defendants' online ads contain considerably more detail.  In May 2010, for example,

defendants posted an ad on CareerBuilder.com for a job in "Pharmaceutical Sales and Medical

Device Sales."  The ad includes the following details in a "job snapshot" at the top of the first

screen:

Pharmaceutical Sales and Medical Device Sales
NSG

**Job Snapshot**

| | |
|---|---|
| Location: | Worcester, MA 01601 |
| Base Pay: | $40,000 - $60,000 /Year |
| Commission: | $30,000.00 |
| Other Pay: | bonuses quarterly |
| Employee Type: | Full-Time |
| Industry: | Medical Equipment Pharmaceutical Sales - Marketing |
| Manages Others: | No |
| Job Type: | Marketing Pharmaceutical Sales |
| Education: | 4 Year Degree |
| Experience: | Not Specified |
| Travel: | Negligible |
| Post Date: | 5/5/2010 |

**Contact Information**

| | |
|---|---|
| Phone: | 1-866-291-6398 |

[7] PX 1, Menjivar Dec., ¶ 22(b) & Att. P.

[8] *See, e.g.*, PX 1, Menjivar Dec., ¶ 22(a), 22(b), 22(c) & Atts. O-Q; PX 7, Campbell Dec., ¶ 2.

The ad continues with further details about the purported job, and instructs interested consumers to "[c]all human resources at 866-291-6398."[9]

Defendants posted thousands of similar ads on CareerBuilder.com from 2005 to 2010, often running an ad for a specific job, in a specific city, for months at a time.[10] Not surprisingly, consumers interpret such ads as genuine help wanted ads, for real jobs, posted by a prospective employer or its authorized recruiter.[11]

Defendants also use websites, such as nationalsalesgroup.com and nsgrecruitone.com, to market themselves as recruiters for major corporations with job openings. On their websites, defendants represent that NSG is a "full service staffing and recruitment company" that has "joined forces with hundreds of Fortune 1000, regional and local companies to link the largest and most effective sales pool in the country." They claim that "NSG has already helped OVER 54,000 Sales Reps get the sales career they dreamed of," and boast of connecting consumers to "[o]pportunities with lasting six figure incomes and beyond." Like defendants' help wanted ads, the websites instruct consumers to call defendants at a toll-free number.[12]

---

[9] PX 15, Lessard Dec. Att. A. Before cutting NSG off entirely, CareerBuilder required NSG to mention its fees in its ads. NSG inserted language about the fees at the tail end of the ads – well below the purported job details. Even if consumers scroll to the end, however, the reference to fees does nothing at all to correct the impression that defendants are hiring people. There is nothing to indicate that this appended language pertains in any way to the "job posting" that precedes it. There is no company name or telephone number in the appended language. In fact, because CareerBuilder's web sites are replete with banners and other advertising, a consumer might well conclude that this content at the end is an offer unrelated to the job posting.

[10] PX 2, Butler Dec., ¶ 7.

[11] PX 5, Burgess Dec., ¶ 2; PX 6, Callihan Dec., ¶ 2; PX 7, Campbell Dec., ¶¶ 2-3; PX 11, Dumas Dec., ¶ 2; PX 12, Goodson Dec., ¶ 2; PX 15, Lessard Dec., ¶ 5; PX 16, Minieri Dec., ¶ 2; PX 18, Prescott Dec., ¶ 2; PX 21, Socha Dec., ¶ 2.

[12] PX 1, Menjivar Dec., ¶¶ 8-9 & Att. G, pp. 1, 4 & Att. H, p. 2.

**B.    Outbound Calls and Voicemails**

Defendants also call consumers directly.  In fact, since being kicked off

CareerBuilder.com in July 2010, defendants increasingly have relied on outbound telemarketing

as a means of initial consumer contact.  Defendants claim to be calling about open sales

positions and in response to job applications or resumes consumers have posted online.[13]  When

consumers do not answer, defendants leave messages, such as:

> Hi, this is Dan and we just received your application for our pharmaceutical sales
> positions through CareerBuilder.  After a brief review, we feel there might be a
> position available, so please call us back at 888-297-7829.  Again, 888-297-7829.
> Thank you so much.  Bye bye.[14]

The messages do not disclose a company name or offer to sell goods or services.  Instead, like

the deceptive job ads, the messages create the impression that defendants are hiring or recruiting

to fill open positions.  As defendants know, this dramatically increases the odds that consumers

will call them back.[15]

**C.    Defendants' Deceptive Sales Pitch**

Consumers who call defendants in response to help wanted ads (or answer their calls) are

connected to defendants' telemarketers, who typically identify themselves as "human resources,"

---

[13]  PX 1, Menjivar Dec., ¶¶ 59-60; PX 2, Butler Dec., ¶¶ 12, 20 & Att. B, pp. 15, 18, 20
(consumer complaints emailed to CareerBuilder about defendants' misleading calls) & Att. G, pp. 1-4, 6-
8 (same); PX 8, Clayton Dec., ¶¶ 2-3; PX 9, Costello Dec., ¶ 2; PX 13, Jones Dec., ¶ 3; PX 17,
Mothershead Dec., ¶ 3; PX 19, Reed Dec., ¶ 2; PX 20, Smiley Dec., ¶ 3; PX 22, Urban Dec., ¶ 3.

[14]  PX 8, Clayton Dec. ¶¶ 2-3; *see also* PX 1, Menjivar Dec., ¶¶ 59-60 (transcribed voicemail);
PX 2, Butler Dec., ¶¶ 12, 20 & Att B, pp. 15, 18 & Att. G, pp. 2-4, 7-8; PX 9, Costello Dec., ¶ 2; PX 19,
Reed Dec., ¶ 2.

[15]  *See* PX 8, Clayton Dec., ¶¶ 4-5 (consumer laid off from previous sales job believed
defendants' message was from employer with openings in pharmaceutical sales); PX 9, Costello Dec.,
¶¶ 3, 7 (unemployed consumer returned defendants' call expecting to speak with prospective employer);
PX 19, Reed Dec., ¶ 2 (consumer called defendants in response to apparent message from recruiter; she
would never have called back seller of informational services or training books).

and then deliver a scripted sales pitch designed to reinforce the impression that defendants can place consumers in high-paying jobs. The telemarketers generally shift course from the false hiring claims made so strongly in the ads to an equally bogus recruitment pitch.[16] Many consumers who call are unemployed and especially vulnerable to defendants' deceptive tactics.[17]

Defendants' telemarketers tell consumers that NSG is a recruiter for Fortune 500 and 1000 companies, often mentioning specific well known companies such as Pfizer, Eli Lilly, and Johnson & Johnson. These major companies, the telemarketers state, authorize and pay NSG to identify the best candidates for job openings.[18] As one telemarketer told an FTC investigator

---

[16] PX 1, Menjivar Dec., ¶¶ 24-27, 56-58, 61-63 & Att. V, pp. 4-30 (transcript of undercover call to NSG) & Att. YY (defendants' Certified Sales Jobs telemarketing script) & Att. ZZ (consumer complaints); PX 2, Butler Dec., ¶¶ 12, 20 & Atts. B, G (consumer complaints); PX 5, Burgess Dec., ¶¶ 3-6; PX 6, Callihan Dec., ¶¶ 3-6; PX 7, Campbell Dec., ¶¶ 4-8; PX 8, Clayton Dec., ¶¶ 5-9; PX 9, Costello Dec., ¶¶ 4-6; PX 10, DeIuliis Dec., ¶ 3; PX 11, Dumas Dec., ¶ 3; PX 12, Goodson Dec., ¶¶ 3-5; PX 14, Kamburoff Dec., ¶¶ 3-6; PX 15, Lessard Dec., ¶¶ 6-8; PX 16, Minieri Dec., ¶¶ 3-6; PX 17, Mothershead Dec., ¶¶ 3-4; PX 18, Prescott Dec., ¶ 4; PX 19, Reed Dec., ¶¶ 3-6; PX 20, Smiley Dec., ¶¶ 3-7; PX 21, Socha Dec., ¶¶ 3-6; PX 22, Urban Dec., ¶¶ 3-7.

[17] *See, e.g.,* PX 2, Butler Dec., ¶ 12 & Att. B, p. 8 (defendants overcharged consumer and took money she needed for gas and food); PX 5, Burgess Dec., ¶¶ 2-10 (defendants scammed recent college graduate trying to start career); PX 6, Callihan Dec., ¶ 2 (consumer victim had been unemployed for four months); PX 9, Costello Dec., ¶ 3 (unemployed consumer); PX 14, Kamburoff Dec., ¶ 2 (stay-at-home mother trying to return to work force); PX 15, Lessard Dec., ¶¶ 1, 8 (consumer, aged 62, living on unemployment benefits and temporary work); PX 16, Minieri Dec., ¶ 2 (unemployed for two years); PX 20, Smiley Dec., ¶ 2 (unemployed for nine months); PX 22, Urban Dec., ¶ 2 (unemployed for a year).

[18] PX 1, Menjivar Dec., ¶ 26 & Att. V, p. 11 (taped undercover call – "We work with Pfizer, Merck, Novartis, Aventis, Bristol Meyers, Eli Lilly") & Att. V, p. 13 ("[T]he faster you're actually placed, the sooner we can get paid because we're not paid until after you're hired through your actual employer. They pay us.") & Att. YY, p. 2 (telemarketing script – "Now since many of these firms are Fortune 1000 companies, they require us to pre-screen all applicants.") & Att. YY, p. 3 ("We get paid based on placement, so once you accept a position with any of these companies they will pay us our fee directly.") & Att. ZZ p. 6 (consumer was told NSG was "working for Fortune 500 companies."); PX 5, Burgess Dec., ¶ 4 (telemarketer claimed "NSG was working directly with Johnson & Johnson and Siemens."); PX 8, Clayton Dec., ¶ 7 (telemarketer said Fortune 1000 companies pay NSG to find the most qualified applicants to fill open sales positions); PX 18, Prescott Dec., ¶ 4 (same); PX 12, Goodson Dec., ¶ 3 (telemarketer said major pharmaceutical firms paid NSG to pre-screen and conduct background checks on potential hires); PX 14, Kamburoff Dec., ¶ 4 (telemarketer said NSG's clients included many Fortune 500 companies).

posing as a consumer:

> We work with only Fortune 500 and Fortune 1000 companies. . . .
> These companies come to us and tell us, we just have a bunch of
> people who just left or we opened a new building and we need so
> many entry levels, so many advanced and so many in between in
> sales, marketing and management, and we basically just stock their
> buildings.[19]

The telemarketers represent that these job opportunities are not available on free online job

boards, but are exclusively available through NSG. They state that NSG will present consumers'

resumes to its corporate clients and use its longstanding relationships with these companies to

get consumers interviewed and hired.[20]

> [W]e actively go out and present your profile to these client
> companies, and then we suggest to them that they interview you as
> a qualified applicant, which then the interview usually is set forth,
> because we have been working with these companies for the past
> six years and our opinion is very highly respected.[21]

The telemarketers claim that NSG has a very high placement rate. They claim that most

consumers who sign up with NSG get interviews within about two weeks, and employment

---

[19] PX 1, Menjivar Dec., Att. V, pp. 13-14.

[20] PX 1, Menjivar Dec., ¶ 26 & Att. V, pp. 5-6 (telemarketer said NSG has "developed relationships with and serviced over 700 companies nationwide in eight different vertical markets"); PX 2, Butler Dec., Att. B, p. 8 (telemarketer said NSG "work[s] with 700+ companies that have openings that are not listed on Career Builder or Monster"); PX 5, Burgess Dec., ¶ 4 (consumer led to believe she would have to go through NSG to get pharmaceutical sales job); PX 15, Lessard Dec., ¶ 8 (same); PX 6, Callihan Dec., ¶¶ 3-4 (telemarketer said NSG had great relationships with hiring firms and would contact the firms on consumer's behalf); PX 8, Clayton Dec., ¶ 7 (consumer was told Fortune 1000 companies had hired NSG to fill jobs not listed anywhere publicly); PX 16, Minieri Dec., ¶ 3 (consumer was told NSG had exclusive job postings); PX 19, Reed Dec., ¶ 4 (telemarketer claimed NSG was working as recruiter for large pharmaceutical firm in Boulder, Colorado, consumer's home town); PX 20, Smiley, ¶ 3 (NSG described to consumer as exclusive recruiter for companies with job openings not posted on free online job boards like CareerBuilder.com).

[21] PX 1, Menjivar Dec., Att. V, pp. 11-12.

10

within a month.[22]

The telemarketers also claim that jobs are currently available in consumers' home towns and that consumers can expect to earn significant sums. They ask consumers for their zip codes, and then tell consumers that job openings are currently available in the communities where consumers live. The telemarketers frequently claim that there are many or "tons" of positions available locally through NSG.[23] Like the ads, the telemarketers quote specific salaries, commissions, bonuses and other benefits of the jobs. They state or imply that consumers are likely to earn six figures.[24]

After building up the job opportunities in this way, defendants then reveal that consumers have to pay certain fees. The telemarketers first mention a $29 "pre-screening" fee. They claim that this fee covers background checks required by the employers who have hired defendants to screen job applicants.[25] As a telemarketer stated, "That's a background check. It does your driving records and it goes over everything that these companies need in order to actually place

---

[22] *Id.*, Att. V, p. 13 ("[M]ost of our clients are interviewing within the first two weeks and most clients are completely situated with their new positions within the first 30 days.") & Att. ZZ, p. 24 (consumer was told NSG has a 75% to 80% placement rate within the first four weeks); PX 2, Butler Dec., Att. B, p. 3 (consumer was promised 2-4 interviews in a few weeks) & Att. B, pp. 6, 8 (consumers were promised interviews within two weeks); PX 12, Goodson Dec., ¶ 4 (consumer was promised pharmaceutical sales job within weeks); PX 16, Minieri Dec., ¶ 5 (consumer was guaranteed an interview and a new job within 30 days); PX 21, Socha Dec., ¶ 4 (consumer was promised interview if he paid NSG's fee).

[23] PX 1, Menjivar Dec., ¶¶ 25, 26(b) & Att. V, pp. 4-6 (transcript of undercover call) & Att. YY, pp. 1-2 (telemarketing script); PX 2, Butler Dec., Att. B, pp. 5, 8 (consumer complaints) & Att. G, pp. 3, 7 (same); PX 8, Clayton Dec., ¶ 6; PX 9, Costello Dec., ¶ 5; PX 14, Kamburoff Dec., ¶ 3; PX 22, Urban Dec., ¶ 4.

[24] PX 1, Menjivar Dec., Att. V, p. 15; PX 2, Butler Dec., Att. G, p. 7; PX 5, Burgess Dec., ¶ 4; PX 16, Minieri Dec., ¶ 5; PX 22, Urban Dec., ¶ 4.

[25] PX 1, Menjivar Dec., Att. ZZ, p. 21; PX 2, Butler Dec., Att. B, p. 15 & Att. G, p. 4; PX 12, Goodson Dec., ¶¶ 3-4.

11

you."[26] Defendants also charge $9 for shipping out their welcome package, and $59 for a book about sales authored by Anthony Newton. Telemarketers tell consumers that studying this book will improve their chances of being hired, but also assure consumers that they are free to return the book within 30 days for a full refund.[27] The telemarketers downplay these fees and claim they make their money from employers when consumers are hired – as one put it, "I don't get paid until you're hired."[28] In reality, the fees are all defendants care about, to the point that defendants frequently charge consumers without authorization.[29] Defendants have taken in over $8 million to date.[30]

### D. Defendants' Purported Services

After paying defendants' fees, consumers are dismayed to learn that everything defendants told them over the phone is false. Defendants are not recruiters working for Fortune 1000 employers, and cannot arrange interviews or grease the wheels for consumers to get jobs. Instead, what defendants deliver to consumers (through their website or emails) are help wanted ads cut and pasted from free online job boards.[31] Having collected their fees, defendants now openly admit they have no connection to prospective employers. They expressly tell consumers

---

[26] PX 1, Menjivar Dec., ¶ 26(e) & Att. V, p. 10.

[27] *Id.*, ¶¶ 31, 33 & Att. V, p. 17 & Att. ZZ, p. 6; PX 2, Butler Dec., Att. B, p. 19.

[28] PX 1, Menjivar Dec., Att. V, p. 24.

[29] *See* Section III.E.

[30] PX 1, Menjivar Dec., ¶¶ 53-55.

[31] *Id.*, ¶¶ 44-52 & Atts. KK-VV & Att. ZZ, p. 3 (NSG job posts "funneled in from free websites") & Att. ZZ, pp. 14, 20, 26, 28 (same job posts are on free websites like CareerBuilder or Monster); PX 2, Butler Dec., Att. B, p. 7; PX 10, DeIuliis Dec., ¶ 8; PX 11, Dumas Dec., ¶ 5; PX 14, Kamburoff Dec., ¶ 7; PX 20, Smiley Dec., ¶ 13.

to deal with the employers on their own.[32] Employers whose listings have been forwarded by defendants confirm that they have no relationship with defendants. These employers have no interest in defendants re-circulating their help wanted ads, which are publically available for free on major job boards.[33]

To make matters worse, the job postings forwarded by defendants are often stale, having been posted for days or weeks on other sites, and may already be filled. Some consumers receive no job postings at all, or receive postings for jobs located far outside their local areas. Some ads consumers receive are for non-sales jobs with low pay or experience prerequisites consumers cannot meet.[34] In reality, defendants do nothing but lead consumers in a circle – they lure consumers with fraudulent help wanted ads and recruiting calls, charge them hefty fees, and then provide them with someone else's help wanted ads. Defendants simply waste consumers' time, and bring them no closer to getting a job.

### E.    Unauthorized Charges and Denial of Refunds

Defendants' scheme gets even worse, however, because they routinely charge consumers extra fees without their authorization. Many consumers are charged $59 for Newton's book on sales, despite having refused to buy it during the sales call. They expect to pay about $29 or $38,

---

[32] PX 1, Menjivar Dec., ¶¶ 48, 51 & Atts. KK, MM, OO, QQ, SS, UU (NSG emails state that consumers must apply directly to prospective employers and that NSG is not part of the interviewing or hiring process); PX 2, Butler Dec., Att. B, p. 4.

[33] PX 1, Menjivar Dec., ¶¶ 44-47; PX 3, Barra Dec., ¶¶ 3-6; PX 4, Heerdink Dec., ¶¶ 3-5.

[34] PX 1, Menjivar Dec., ¶¶ 48-52 & Att. ZZ, pp. 9, 20-21, 24-25; PX 2, Butler Dec., Att. B, pp. 1, 6, 8, 17; PX 5, Burgess Dec., ¶ 8; PX 10, DeIuliis Dec., ¶¶ 5-6, 10; PX 16, Minieri Dec., ¶ 9; PX 20, Smiley Dec., ¶ 10.

but find a $97 charge on their statement.[35]  Some consumers are charged for the book despite

having never received it.[36]  Defendants also charge consumers a $13.71 monthly fee, often not

disclosed adequately if at all during sales calls, but only in small print terms of service sent to

consumers afterwards.  These charges continue indefinitely until consumers take action to stop

them.  Consumers have been shocked to discover the charges on their statements, sometimes

after being charged for several months without their knowledge or consent.[37]

Defendants do everything possible to keep consumers' money.  They routinely ignore or

deny consumers' requests for refunds, often treating consumers with contempt in the process.[38]

Only the few consumers who are very persistent or complain to the BBB or law enforcement are

able to get refunds.[39]  Although defendants claim during sales calls that the $59 sales book is

fully refundable within 30 days of purchase, consumers later learn that defendants' time-

consuming refund procedure requires consumers to: (1) request that defendants send them a

refund request form to fill out and return with the book; (2) ship the book back to Santa Barbara

---

[35] PX 1, Menjivar Dec., ¶¶ 61-63 & Att. ZZ, pp. 1-2, 4-5, 7-8, 11-12, 13, 16, 19, 22, 25, 27-30 (consumer complaints about unauthorized charges); PX 2, Butler Dec., Att. B, pp. 6-8, 12-13, 18-20 & Att. G, p. 4 (same); *see also* PX 6, Callihan Dec., ¶¶ 5-10; PX 14, Kamburoff Dec., ¶ 8 (NSG's unauthorized overcharge of $70 could have paid for consumer's groceries for a week);

[36] PX 2, Butler Dec., Att. B, p. 9; PX 5, Burgess Dec., ¶ 8; PX 15, Lessard Dec., ¶¶ 10-12; PX 18, Prescott Dec., ¶¶ 6-7.

[37] PX 1, Menjivar Dec., Att. ZZ, pp. 15, 18, 23, 30 (consumer complaints about unauthorized recurring charges); PX 2, Butler Dec., Att. B, pp. 9, 20 (same); *see also* PX 16, Minieri Dec., ¶¶ 10-11; PX 18, Prescott Dec., ¶¶ 7-13; PX 19, Reed Dec., ¶¶ 11-13 & Att. C.

[38] PX 1, Menjivar Dec., Att. ZZ, p. 4; PX 2, Butler Dec., Att. B, pp. 2, 5, 8; PX 5, Burgess Dec., ¶ 8; PX 6, Callihan Dec., ¶ 9; PX 7, Campbell Dec., ¶ 14; PX 10, DeIuliis Dec., ¶¶ 6, 9-10; PX 12, Goodson Dec., ¶¶ 8-9; PX 14, Kamburoff Dec., ¶¶ 9-10; PX 16, Minieri Dec., ¶ 10; PX 18, Prescott Dec., ¶¶ 6-13; PX 19, Reed Dec., ¶ 13; PX 20, Smiley Dec., ¶¶ 15-16; see also PX 1, Menjivar Dec., Att. ZZ (consumer complaints); PX 2, Butler Dec., Atts. B, G (consumer complaints).

[39] PX 15, Lessard Dec., ¶ 15 (received refund after complaining to BBB).

14

at their own expense; and (3) call defendants a week later to confirm that they received the book. Even when consumers follow this procedure to the letter, however, defendants have withheld refunds, as an FTC investigator posing as a consumer experienced first-hand.[40]

### F.    Defendants' Continued Operations

Defendants will go to any lengths to keep their fraudulent enterprise alive. Thousands of consumers have complained about defendants' unlawful activities. Yet not even this impressive deluge of complaints has deterred defendants from continuing their predatory scheme.

Indeed, once CareerBuilder confronted defendants about their practices, instead of reforming and advertising their purported services honestly, defendants tried to stay in business by simply changing their name. Before kicking NSG off its site, CareerBuilder sent Newton and Cooley an investigative report citing (and quoting excerpts from) the 17,000 complaints it had received about NSG's job postings, and noting NSG's rating of "F" with the BBB.[41] Newton and Cooley responded by telling CareerBuilder they had formed a new company, Executive Sales Network ("ESN"), based in Los Angeles. Newton and Cooley asked CareerBuilder to let them resume posting help wanted ads as ESN, and pointed out that ESN had at the time a "B+" rating with the BBB (it now has an "F").[42] CareerBuilder rejected this transparent ploy, but offered them the option of switching to "BOF" postings, used for business opportunities charging up-front fees, which jobseekers have the option of excluding from search results.

---

[40] PX 1, Menjivar Dec., ¶¶ 33-38 & Atts. AA-DD; PX 14, Kamburoff Dec., ¶¶ 9-10.

[41] PX 2, Butler Dec., ¶¶ 13-16 & Atts. C-D.

[42] PX 2, Butler Dec., ¶ 16 & Att. D; PX 1, Menjivar Dec., ¶ 65 & Att. BBB (current BBB report for ESN). In reality, ESN was a fictitious business name defendants had recently registered for their Santa Barbara operation, and the Los Angeles address was an unlicensed mail drop. PX 1, Menjivar Dec., ¶¶ 7, 17 & Att. F (fictitious business name statement for ESN).

Newton and Cooley rejected this option. On July 6, 2010, CareerBuilder removed all of their ads from its site.[43]

Instead of reforming their practices, defendants have simply tried to escape from the terrible reputation of NSG. They currently operate under the name Certified Sales Jobs, using the same premises and deceptive sales pitch, and seeking more telemarketers to expand their boiler room.[44] They repeat the same lies about recruiting for the Fortune 1000 and getting consumers interviews in 3-4 weeks.[45] But they tell consumers, and law enforcement agencies forwarding complaints, that their business is located in Los Angeles.[46] Their new script includes a standard response to the questions "Are you guys NSG? . . . Or affiliated with National Sales Group?" The required answer is, "No, we are Certified Sales Jobs."[47]

## IV.   ARGUMENT

The Commission seeks injunctive relief to prevent defendants from continuing to violate the law while the case is pending. We ask that the Court also freeze defendants' assets to preserve them for restitution to victims. The Court has full authority to enter the requested relief, which is strongly supported by the evidence.

---

[43] PX 2, Butler Dec., ¶¶ 7(a), 17-18 & Att. E.

[44] PX 1, Menjivar Dec., ¶ 23 & Atts. T-U (recent help wanted ads seeking telemarketers in Santa Barbara, listing toll-free number belonging to I Life/NSG); *see* PX 13, Jones Dec., ¶¶ 3-9 & Atts. A-D; PX 17, Mothershead Dec., ¶¶ 3-5.

[45] PX 1, Menjivar Dec., ¶¶ 57-58 & Att. YY, p. 2 (Certified Sales Jobs telemarketing script). The phone number for Certified Sales Jobs' "client services department" is a toll-free number belonging to I Life/NSG. *Id.*, ¶ 58 & Att. YY, p. 5.

[46] PX 1, Menjivar Dec., ¶ 12 & Att. K (Certified Sales Jobs website lists Los Angeles address); PX 13, Jones Dec., ¶ 9 & Att. D (Certified Sales Jobs responded to consumer complaint – forwarded by N.C. Attorney General's office – on I Life stationary faxed from NSG).

[47] PX 1, Menjivar Dec., ¶¶ 56-58 & Att. YY, p. 2 (script).

## A.  The Court has Authority to Grant the Requested Relief.

The FTC Act provides that "in proper cases the Commission may seek, and after proper proof, the court may issue a permanent injunction." 15 U.S.C. § 53(b). The practice of defrauding consumers by misrepresenting or omitting material facts presents a "proper case" for injunctive relief under 15 U.S.C. § 53(b). *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1028 (7th Cir. 1988); *see also FTC v. Bay Area Business Council, Inc.*, 423 F.3d 627, 634 (7th Cir. 2005). Under that section, the full breadth of the court's authority is available, including the power to grant such ancillary final relief as rescission of contracts and restitution. *FTC v. Febre*, 128 F.3d 530, 534 (7th Cir. 1997); *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 571-72 (7th Cir. 1989). The court may also enter whatever preliminary relief is necessary to preserve the possibility of providing effective final relief, including an order freezing assets for eventual restitution to victims. *World Travel*, 861 F.2d at 1026, 1031; *see also Amy Travel*, 875 F.2d at 571.

## B.  The Commission Meets the Applicable Legal Standard for Issuance of a Temporary Restraining Order and Preliminary Injunction.

To grant preliminary injunctive relief in an FTC Act case, the district court "'must 1) determine the likelihood that the Commission will ultimately succeed on the merits and 2) balance the equities.'" *World Travel*, 861 F.2d at 1029 (quoting *FTC v. Warner Communications, Inc.*, 742 F.2d 1156, 1160 (9th Cir. 1984)); *see also FTC v. Datacom Mktg. Inc.*, No. 06 C 2574, 2006 U.S. Dist. LEXIS 33029, at *10-11 (N.D. Ill. May 24, 2006) (Holderman, C.J.). Under this "public interest" test, "it is not necessary for the FTC to demonstrate irreparable injury." *World Travel*, 861 F.2d at 1029. Unlike a private litigant, moreover, who generally must show a strong or substantial likelihood of success, the

17

Commission need only make the statutory showing of a likelihood of ultimate success. *Id.* And when the court balances the equities, the public interest "must receive far greater weight" than any private concerns. *Id.* Preliminary injunctive relief is therefore appropriate if the Commission shows a likelihood of success on the merits and that a balancing of the equities, giving greater weight to the public interest, favors such relief.

### C.   The FTC Has Demonstrated a Strong Likelihood of Success on the Merits.

### 1.   Defendants are Violating the FTC Act and the TSR

Defendants' activities clearly qualify as deceptive acts or practices under Section 5(a) of the FTC Act, 15 U.S.C. § 45(a). An act or practice is deceptive if it involves a material misrepresentation or omission that is likely to mislead consumers acting reasonably under the circumstances. *See Bay Area Business Council,* 423 F.3d at 635; *FTC v. World Media Brokers,* 415 F.3d 758, 763 (7th Cir. 2005); *World Travel,* 861 F.2d at 1029. The materiality requirement is satisfied if the misrepresentation or omission involves information that is likely to affect a consumer's choice of, or conduct regarding, a product or service. *Kraft, Inc. v. FTC,* 970 F.2d 311, 322 (7th Cir. 1992); *Datacom Mktg.,* 2006 U.S. Dist. LEXIS 33029, at *13. In deciding whether particular statements are deceptive, courts must look to the "overall net impression" of consumers. *See Kraft,* 970 F.2d at 322.

Submitting unauthorized charges to consumers' accounts is an "unfair" practice that violates Section 5. Under Section 5(n) of the FTC Act, an act or practice is unfair if it causes or is likely to cause substantial injury to consumers that is not reasonably avoidable by consumers and is not outweighed by countervailing benefits to consumers or to competition. *See* 15 U.S.C. § 45(n); *see also Orkin Exterminating Co., Inc. v. FTC,* 849 F.2d 1354, 1363-66 (11th Cir. 1988). Defendants routinely charge consumers' credit or debit cards without their express

18

informed consent, either because the consumer was not adequately informed of the terms and conditions of the offer, or did not agree to be charged. Such conduct is consistently held to be unfair under the FTC Act. *See, e.g., FTC v. Global Mktg. Group, Inc.*, 594 F. Supp. 2d 1281, 1288-89 (M.D. Fla. 2008); *FTC v. J.K. Publications, Inc.*, 99 F. Supp. 2d 1176, 1201 (C.D. Cal. 2000).

The same conduct that violates the FTC Act violates the TSR. The TSR prohibits sellers and telemarketers from: (1) misrepresenting any material aspects of the goods or services for sale; (2) misrepresenting that they are affiliated with, or endorsed or sponsored by, any other person; and (3) making any false or misleading statement to induce any person to pay for goods or services. 16 C.F.R. §§ 310.3(a)(2)(iii) & (vii); 16 C.F.R. § 310.3(a)(4). The TSR also prohibits sellers or telemarketers from causing "billing information from being submitted for payment, directly or indirectly, without the express informed consent of the consumer." 16 C.F.R. § 310.4(a)(7). In addition, the TSR requires telemarketers in outbound calls to disclose "truthfully, promptly, and in a clear and conspicuous manner" the identity of the seller, that the purpose of the telemarketing call is to sell goods or services, and the nature of those goods or services. 16 C.F.R. § 310.4(d)(1), (2) & (3).

In this case, as described above, defendants violate the FTC Act and the TSR by making a series of false claims that are designed to defraud consumers seeking employment. Through their advertisements and telemarketing calls, defendants misrepresent that: (1) defendants are themselves hiring consumers, are hiring on behalf of others, or are recruiters affiliated with others who are hiring; (2) one or more jobs are currently available through defendants in consumers' local areas; and (3) paying a fee to defendants for access to jobs makes consumers likely to earn substantial income. Defendants' false claims are clearly material, in that they are

19

likely to and do affect consumers' conduct. Defendants also violate the FTC Act and the TSR by charging consumers without authorization, and violate the TSR by failing to promptly and truthfully disclose the seller's identity, the purpose of the call, and the nature of the goods or services.

### 2. Anthony Newton and Jeremy Cooley Are Individually Liable.

Defendants Newton and Cooley are the perpetrators of this illicit scheme and are individually liable for the violations of the FTC Act and TSR described above. An individual may be held liable for corporate practices where he or she (1) participated directly in or had authority to control the acts or practices; and (2) knew or should have known about those practices. *World Media Brokers*, 415 F.3d at 764; *see also Bay Area Business Council*, 423 F.3d at 636; *Amy Travel*, 875 F.2d at 573-74. Authority to control can be evidenced by "active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer." *Amy Travel*, 875 F.2d at 573. The Commission need not show intent to defraud. *Id.* at 573-74. Instead, the knowledge requirement may be satisfied by a showing that the individual (1) had actual knowledge of the deceptive acts or practices, (2) was recklessly indifferent to the truth or falsity of the representations, or (3) had an awareness of a high probability of fraud coupled with an intentional avoidance of the truth. *Bay Area Business Council*, 423 F.3d at 636; *World Media Brokers*, 415 F.3d at 764. The "degree of participation in business affairs is probative of knowledge." *Amy Travel*, 875 F.2d at 574.

Newton is NSG's only director and holds all corporate titles, including CEO. He is listed as NSG's primary contact and decision maker in advertising contracts with CareerBuilder. He signed the contracts as well, and paid for the advertising with his credit card. He also is listed as

20

the administrative and technical contact for NSG's websites.[48]  Cooley, along with Newton, is a

manager of I life.  Cooley also registered a website used in defendants' scheme,

certifiedsalesjobs.com.[49]  Cooley communicated directly with CareerBuilder, holding himself out

as the CEO of ESN.  He personally appealed to CareerBuilder to keep NSG's final job postings

up on its site until they expired, and to accept new job postings from ESN.[50]  Given these facts,

both Newton and Cooley clearly meet the standard for individual liability.

**D.  The Equities Tip Decidedly in the Commission's Favor.**

Once the Commission has shown a likelihood of success on the merits, the Court must

balance the equities, assigning greater weight to the public interest than to any of defendants'

private concerns.  *World Travel,* 861 F.2d at 1029.  The public equities in this case are

compelling, as the public has a strong interest in halting the deceptive scheme, and in preserving

the assets necessary to provide effective final relief to victims.  *See FTC v. Sabal,* 32 F. Supp. 2d

1004, 1009 (N.D. Ill. 1998); *Datacom Mktg.,* 2006 U.S. Dist. LEXIS 33029, at *16.  Defendants,

by contrast, have no legitimate interest in continuing to deceive consumers seeking employment,

and to charge consumers without authorization.  *See Sabal,* 32 F. Supp. 2d at 1009; *FTC v.*

*World Wide Factors, Ltd.,* 882 F.2d 344, 347 (9th Cir. 1989) (upholding finding of "no

oppressive hardship to defendants in requiring them to comply with the FTC Act, refrain from

fraudulent representation or preserve their assets from dissipation or concealment.").

---

[48]  PX 1, Menjivar Dec., ¶¶ 6(b), 6(c), 13-14 & Atts. B-C (NSG corporate records) & Atts. L-M (domain registration information for NSG websites); PX 2, Butler Dec., ¶ 5 & Att. A, pp. 2-3, 5, 7, 9, 12-13 (CareerBuilder contracts).

[49]  PX 1, Menjivar Dec., ¶¶ 6(e), 15 & Att. M (I Life corporate records).

[50]  PX 2, Butler Dec., ¶¶ 5, 14-18 & Atts. D-E (emails between Cooley and CareerBuilder).

21

### E. The Court Should Enter The FTC's Proposed TRO.

To prevent defendants from dissipating or concealing their assets, the requested TRO

should be issued *ex parte*. An *ex parte* TRO is warranted where the facts show that irreparable

injury, loss, or damage will result before defendants can be heard in opposition. *See* Fed. R. Civ.

P. 65(b). The utterly fraudulent nature of defendants' scheme, coupled with unauthorized

billing, their attempts to conceal their true location, and their treatment of consumers seeking

refunds, all indicate there is a serious risk that these defendants will destroy documents and

dissipate assets if given advance notice of the Commission's motion. The FTC's extensive

experience with others engaged in similar deceptive schemes demonstrates that, if given notice,

defendants may withdraw funds from bank accounts and destroy pertinent records before the

assets and records can be secured.[51] In other FTC cases, courts in this district have consistently

granted restraining orders on an *ex parte* basis under similar circumstances.[52]

---

[51] *See* Declaration and Certification of Plaintiff's Counsel Pursuant to Fed. R. Civ. P. 65(b) and Local Rule 5.5(d) in Support of Plaintiff's *Ex Parte* Motion for Temporary Restraining Order and Motion to Temporarily Seal File, filed concurrently with this motion (describing need for *ex parte* relief and citing cases in which defendants who learned of impending FTC action withdrew funds, destroyed vital documents, and fled the jurisdiction).

[52] *See, e.g., FTC v. Asia Pacific Telecom Inc., et al.*, No. 10 C 3168, (N.D. Ill. May 25, 2010) (Hart, J.); *FTC v. API Trade, LLC, et al.*, No. 10 C 1543 (N.D. Ill. Mar. 10, 2010) (Guzman, J.); *FTC v. 2145183 Ontario Inc., et al.*, No. 09 C 7423 (N.D. Ill. Nov. 30, 2009) (Grady, J.); *FTC v. 6555381 Canada Inc., et al.*, No. 09 C 3158 (N.D. Ill. June 1, 2009) (Gettleman, J.); *FTC v. 6654916 Canada Inc., et al.*, No. 09 C 3159 (N.D. Ill. May 27, 2009) (Darrah, J.); *FTC v. Integration Media Inc., et al.*, No. 09 C 3160 (N.D. Ill. May 27, 2009) (Bucko, J.); *FTC v. Voice Touch, Inc., et al.*, No. 09 C 2929, (N.D. Ill. May 15, 2009) (Grady, J.); *FTC v. Atkinson, et al.*, No. 08 C 5666 (N.D. Ill. Oct. 6, 2008) (Kendall, J.); *FTC v. Data Bus. Solutions Inc., et al.*, No. 08 C 2783 (N.D. Ill. May 14, 2008) (Dow, J.); *FTC v. Spear Sys., Inc. et al.*, No. 07 C 5597 (N.D. Ill. Oct. 3, 2007) (Andersen, J.); *FTC v. Sili Neutraceuticals, LLC, et al.*, No. 07 C 4541 (N.D. Ill. Aug. 13, 2007) (Kennelly, J.); *FTC v. Select Personnel Mgmt., Inc., et al.*, No. 07 C 0529 (N.D. Ill. Feb. 7, 2007) (Norgle, J.); *FTC v. 1522838 Ontario, Inc., et al.*, No. 06 C 5378 (N.D. Ill. Oct. 4, 2006) (Gettleman, J.); *FTC v. Datacom Mktg., et al.*, No. 06 C 2574 (N.D. Ill. May 9, 2006) (Holderman, J.); *FTC v. Cleverlink Trading Ltd., et al.*, No. 05 C 2889 (N.D. Ill. May 16, 2005) (St. Eve, J.); *FTC v. 3R Bancorp, et al.*, No. 04 C 7177 (N.D. Ill. Nov. 17, 2004) (Lefkow, J.); *FTC v. 120194 Canada Ltd., et al.*, No. 04 C 7204 (N.D. Ill. Nov. 8, 2004) (Gottschall, J.); *FTC v. AVS Mktg., Inc., et al.*, No. 04 C 6915 (N.D. Ill. Oct. 28, 2004) (Moran, J.).

Part of the relief sought by the Commission is restitution for the victims of defendants' fraud. To preserve the possibility for such relief, the Commission seeks a freeze of defendants' assets to prevent concealment or dissipation of assets while the case is pending. An asset freeze is appropriate once the Court determines that the Commission is likely to prevail on the merits and that restitution would be an appropriate final remedy. *See World Travel,* 861 F.2d at 1031 & n.9. In the words of the Seventh Circuit, the district court at that juncture has "a duty" to ensure that defendants' assets are "available to make restitution to the injured consumers." *Id.* at 1031. The asset freeze should extend to individual assets as well because the Commission is likely to succeed in showing that the individual defendants are also liable for restitution. *Id.* (affirming freeze on individual assets); *see also Datacom Mktg.,* 2006 U.S. Dist. LEXIS 33029, at *16-17 (freezing assets of individual and corporate defendants).

The appointment of a temporary receiver also would serve to prevent the destruction of documents and the dissipation of assets while the case is pending. Such an appointment is particularly appropriate where defendants' pervasive fraud presents the likelihood of continued misconduct. If defendants are allowed to remain in control of their business, it is likely that evidence will be destroyed and the fruits of their fraud will be dissipated. A temporary receiver would eliminate those risks without disrupting any legitimate business activity. At the same time, a temporary receiver would be helpful to the Court in assessing the extent of defendants' fraud, tracing the proceeds of that fraud, preparing an accounting, and making an independent report of defendants' activities to the Court.

23

## V.    CONCLUSION

Defendants have caused, and are likely to continue to cause, substantial injury to the

public through their violations of the FTC Act and the TSR. The Commission respectfully

requests that the Court issue the proposed TRO to protect the public from further harm and to

help ensure the possibility of effective final relief for defrauded consumers.[53]


Respectfully submitted,

WILLIAM BLUMENTHAL
General Counsel

Dated: February 22, 2011

ROZINA C. BHIMANI
GUY G. WARD
Federal Trade Commission
55 West Monroe Street, Suite 1825
Chicago, Illinois 60603
(312) 960-5634 [telephone]
(312) 960-5600 [facsimile]

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

---

[53] The FTC has submitted a proposed TRO with its papers.